# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Samsung Phone<br>Seized as FP&F No. 2022565400016704 Item 0001<br>("Target Device 2") | )<br>)<br>)<br>)<br>)<br>)<br>) Case No.    '22   MJ3531 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 8, U.S.C. § 1324 | Alien Smuggling |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Giancarlo Lugo, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Giancarlo Lugo, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*

Date: _____ 09/27/2022 _____

_____
*Judge's signature*

City and state: San Diego, California

HON. Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Giancarlo Lugo, being duly sworn, hereby state as follows:

## INTRODUCTION

1.      I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Grey Samsung Phone
> Seized as FP&F No. 2022565400016701 Item 0002
> (**"Target Device 1"**)
>
> Black Samsung Phone
> Seized as FP&F No. 20225654000167041 Item 0001
> (**"Target Device 2"**)

the **Target Devices**, as further described in Attachment A-1 and A-2, and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.      The requested warrants related to the investigation and prosecution of Cruz Enrique RIVERA-Mendez and Christian Eduardo MORENO-Calderon for attempting to transport and move illegal aliens within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

1

## TRAINING AND EXPERIENCE

4.      I have been employed by the USBP since 2008 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for fourteen years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants.  I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California.  I am aware that it is a common practice for alien smugglers to work

2

in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.      The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9.      Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.     This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11.     On September 26, 2022, Border Patrol Agents M. Gerometta, D. Gardner, K. Dawani and Supervisory Border Patrol Agent I. Beltran were conducting assigned duties in the Chula Vista Border Patrol Station's area of responsibility. At approximately 3:00 AM, Agent Gerometta responded to a seismic intrusion device activation at an area known to Border Patrol Agents as "Triple Nickel." Agent Gerometta observed three individuals in the area while utilizing a Forward Looking Infrared device. Agent Gerometta notified Agent Gardner who was operating a Mobile Video Surveillance System (MVSS) that he observed three individuals and is responding to the area. Department of Defense personnel operating a Mobile Surveillance Capabilities (MSC) scope, relayed that they also observed the same three individuals near "Triple Nickel." The MSC operator directed Agent Gerometta to walk towards a large bush, where they had visual of individuals. Agent Gerometta encountered three individuals hiding in a large bush. This area is approximately two miles north of the United States/Mexico International Boundary and one mile east of the Otay Mesa, California Port of Entry. Agent Gerometta identified himself as a Border Patrol Agent and approached the three individuals. Two of the three individuals stood up and ran away from Agent Gerometta. Agent Gerometta was able to detain one individual, later identified as material witness Ivan ARMENDARIZ-Cisneros. Agent Gerometta conducted an immigration inspection, and ARMENDARIZ stated he is a citizen of Mexico without immigration documents allowing him to enter or remain in the United Sates legally. At approximately 3:20 AM, Agent Gerometta placed ARMENDARIZ under arrest.

12.     At approximately 3:05 AM, Agent Gardner observed the two individuals running towards an area known to Border Patrol Agents as "Alta Gate." Agent Dawani responded and upon arrival, the two individuals ran away from Agent Dawani. Agent Gardner noticed that one of the individuals appeared to be on their cell phone. Agent

1 Dawani also observed a silver Honda Pilot, pass his location driving north on Alta Road,
2 the vehicle drove approximately forty yards and did a U-turn. The MSC operator then
notified agents that the two individuals climbed into the Pilot. Agent Dawani then observed
3 the Pilot heading in his direction at a high rate of speed.  As the Pilot approached Agent
4 Dawani's location, Agent Dawani saw the Pilot swerve towards him. Agent Dawani pulled
out his service weapon from his holster and pointed it at the driver of the Pilot, later
5 identified as defendant Cruz Enrique RIVERA-Mendez, at which point RIVERA swerved
6 away from Agent Dawani and continued to drive south on Alta Road.

7        13.    As Agent Beltran was driving north on Alta Road, he observed the Pilot
8 driving south on Alta Road at a high rate of speed.  As the vehicle passed Agent Beltran's
location, he looked in his rearview mirror and saw that the vehicle had made a right turn
9 on Calzada de la Fuente Road. The MSC operator then advised that the vehicle had crashed
10 as it made the turn. Agent Beltran immediately made a U-turn and proceeded to the
11 location. Agent Beltran saw that the vehicle had missed the turn and gone into a dirt lot
where it crashed.

12        14.    The MSC operator notified agents that three individuals exited the vehicle and
13 ran south towards a building off Otay Mesa Road. Agent Gerometta responded to the area
14 on his ATV. Agent Gerometta observed the three individuals and drove towards them.
Agent Gerometta's ordered the three individuals to stop. The individuals disregarded his
15 command and crossed Otay Mesa Road south towards a truck lot. Agent Gerometta
16 observed the three individuals climb over a fence and continued running south between
empty trailers. Agent Gerometta followed the individuals into the truck lot.
17
        15.    The RVSS operator relayed that they observed the three individuals run to the
18 west side of the lot and attempt to hide under and in between the trailers in the lot. This
19 area is approximately one mile north of the United States/Mexico International Boundary
and three-quarter miles east of the Otay Mesa, California Port of Entry. Agent Gerometta
20 ran to the area and encountered one individual, later identified as defendant Christian
21

1  MORENO-Calderon attempting to conceal himself in between the trailers. Agent
2  Gerometta ordered MORENO to come out to which he complied. Agent Gerometta then
3  placed handcuffs on MORENO and conducted an immigration inspection. MORENO
   stated he is a citizen of Mexico without immigration documents allowing him to enter or
4  remain in the United States legally. At approximately 3:25 AM, Agent Gerometta then
5  placed MORENO under arrest.

6  16.    While searching for the other individuals, Agent Beltran encountered one
   individual later identified as material witness J.C.M. (a juvenile). Agent Beltran identified
7  himself as a Border Patrol Agent and conducted an immigration inspection. J.C.M stated
8  that he is a citizen of Mexico without immigration documents allowing him to enter or
   remain in the United States legally. At approximately 3:25 AM, Agent Beltran placed
9  J.C.M under arrest and continued searching for the last individual. Agent Beltran kept
10 looking under the trucks and trailers until he encountered the last individual later identified
11 as defendant, Cruz Enrique RIVERA-Mendez, hiding within the tires of one of the trucks.
   Agent Beltran identified himself as a Border Patrol Agent and ordered RIVERA to come
12 out and at approximately 3:30 AM, Agent Beltran placed RIVERA under arrest, believing
13 he was the driver of the crashed Pilot. Agent Beltran conducted an immigration inspection
14 on RIVERA. RIVERA stated he is a citizen of Mexico without immigration documents
   allowing him to enter or remain in the United States legally.

15 17.    At the time of arrest, a grey Samsung Phone (**Target Device 1**), was found on
16 RIVERA's person, and a black Samsung Phone (**Target Device 2**) was found on
   MORENO's person. Both of these devices were subsequently seized.
17
   18.    At approximately 3:32 PM, defendant Christian Eduardo MORENO Calderon
18 was read his Miranda rights. MORENO stated he understood his rights and was willing to
19 speak without an attorney present. MORENO stated he is a Mexican citizen without
   immigration documents allowing him to enter or remain in the United States. MORENO
20 stated he entered the United States illegally on September 25, 2022, at an unknown time,
21

near Otay Mesa, California. MORENO stated he and his group used a ladder to climb the United States/Mexico boundary fence near Tijuana International Airport. MORENO stated his aunt was helping him pay the smuggling fees of $14,000 USD. MORENO stated that he was also forced to pay $1,000 USD more prior to crossing the International border, in order to pay the 'plaza' fee, which his aunt also assisted with. MORENO admitted to being apprehended by Border Patrol previously and admitted to having been previously removed from the United States. MORENO admitted to previous crossings through Nogales, Arizona, where he was documented as a foot guide for monetary gain. MORENO denied all allegations of guiding, despite having relevant information of an active stash house in Tijuana that would indicate an unusual familiarity for illegal aliens who do not work as foot guides. MORENO stated he was provided a Samsung smartphone in order to guide remotely to the load driver's location, and he was using a secondary phone as his personal device, which was not on MORENO's person at the time of arrest. MORENO stated he received the smartphone for free and was going to throw away the device once he arrived at his destination. MORENO explained he was receiving numerous calls on the provided cell phone but could not answer due to Border Patrol presence in the area. MORENO stated that he did not know which vehicle was coming to smuggle them further north but stated a single individual in a gray truck waved for them to enter the vehicle.

19.     Material witnesses Ivan ARMENDARIZ-Cisneros and J.C.M. (a juvenile) stated they are citizens of Mexico without immigration documents allowing them to enter or remain in the United States legally. ARMENDARIZ and J.C.M. stated smuggling arrangements were made prior to entering the United States. ARMENDARIZ and J.C.M. stated they were going to pay approximately $8,500 USD if successfully smuggled into the United States.

20.     ARMENDARIZ stated he crossed into the United States with two other individuals by walking around the international boundary fence in a location with a mountain in front of them. J.C.M. stated he climbed over two tall fences by simply

8

shimmying up and over the fence.  J.C.M. stated he was fully aware that by entering the United States in this fashion was illegal. J.C.M. stated he walked for approximately five hours before arriving at a hiding place near the pick-up spot.  ARMENDARIZ stated that Cristian MORENO-Calderon guided the group through the mountain and to a road. ARMENDARIZ stated that MORENO told the group that a car would be waiting for them. ARMENDARIZ stated that while near the road, an agent arrested him, and he was separated from the rest of the group.  J.C.M. stated he waited for approximately five minutes before a vehicle passed their position and circled back.  J.C.M. stated the vehicle then stopped in front of them, honked its horn and someone already in the vehicle opened the door for them.  J.C.M. overheard someone yelling, "get in, get in."  J.C.M. stated he entered the vehicle and was seated in the back seat.  When shown a photographic lineup, ARMENDARIZ and J.C.M., were able to identify defendant Cristian MORENO-Calderon as the person who guided the group. J.C.M. was able to identify defendant Cruz Enrique RIVERA-Mendez as the driver of the vehicle in this event.

21.    Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Devices** to communicate with others to further illegal entry into the United States.  Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim.  Accordingly, I request permission to search the **Target Devices** for data beginning on **August 26, 2022, through September 26, 2022.**

9

# METHODOLOGY

22.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23.     Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

24.    Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

25.    Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

## CONCLUSION

26.    Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Section 1324.

27.    Because the **Target Devices** were seized at the time of RIVERA and MORENO's arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **August 26, 2022, through September 26, 2022.**

28.    Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A-1 and A-2, seize the items listed in Attachment B using the above-described methodology.

11

1

I swear the foregoing is true and correct to the best of my knowledge and belief.

2

3

4

Giancarlo Lugo
Border Patrol Agent

5

6   Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P.
    4.1 by telephone on this 27th day of September 2022.

7

8

9   HON. ANDREW G. SCHOPLER
    United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

12

1

## ATTACHMENT A-2

2

PROPERTY TO BE SEARCHED

3   The following property is to be searched:

4   Black Samsung Phone
    Seized as FP&F No. 20225654000016704 Item 0001
5   **("Target Device 2")**

6   Target Device is currently in the custody of the Department of Homeland Security,
    Customs and Border Protection, United States Border Patrol, San Diego Sector.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

**ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **August 26, 2022, through September 26, 2022**:

    a.    tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services--such as email addresses, IP addresses, and phone numbers--used to facilitate alien smuggling and transportation of smuggled aliens;

    c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.

15